**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X         Case No.
AKEIM SMYTHE,

                              Plaintiff,
                                                                        **COMPLAINT**

              -against-

THE STOP & SHOP SUPERMARKET COMPANY                          Plaintiff Demands
LLC,                                                                        A Trial by Jury

                              Defendant.
------------------------------------------------------------------X

  Plaintiff AKEIM SMYTHE (hereinafter "Plaintiff" or "Plaintiff SMYTHE"), by and through his attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the Defendant as follows:

### NATURE OF THE CASE

1. Plaintiff SMYTHE complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 296, *et seq.* and seeks damages to redress the injuries he has suffered as a result of being subjected to discrimination in his place of work on the basis of his sex (sexual harassment) and race (Black) and retaliation for complaining of race discrimination and sexual harassment.

### JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

3. Jurisdiction in this Court is also proper under 28 U.S.C. § 1332(a)(3) as the matter in controversy exceeds the value of $75,000 and is between citizens of different states.

4. This Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the acts complained of occurred therein.

## PROCEDURAL PREREQUISITES

6. By timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 23, 2021, receiving a Notice of Right to Sue from the EEOC, dated February 18, 2022 on April 7, 2022; and commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

## PARTIES

7. At all times relevant hereto, Plaintiff was a resident of the State of New York. Plaintiff currently lives in South Carolina.

8. At all times relevant hereto, Defendant THE STOP & SHOP SUPERMARKET COMPANY LLC (hereinafter referred to as "STOP & SHOP") was a limited liability company with its principal place of business located at 1385 Hancock St, Quincy, MA, 02169-5103.

9. At all times relevant hereto, Defendant STOP & SHOP was a nationwide chain of supermarkets, operating several stores throughout the State of New York.

10. Upon information and belief, Defendant STOP & SHOP is owned by Ahold Delhaize, a grocery retail company.

11. At all times relevant hereto, Plaintiff SMYTHE was an employee of Defendant STOP & SHOP working in certain STOP & SHOP supermarkets in New York.

## MATERIAL FACTS

12. Plaintiff SMYTHE began his employment with Defendant STOP & SHOP on or about October 8, 2018, as a part-time "Produce Clerk" at Defendant's supermarket located at 1831 East Main Street, Peekskill, New York 10566 (hereinafter "Peekskill Store").

13. During Plaintiff SMYTHE's employment at Defendant STOP & SHOP's Peekskill Store, Plaintiff's work performance was above satisfactory.

14. In fact, Plaintiff SMYTHE was awarded "Employee of the Month" shortly after beginning his employment with Defendant STOP & SHOP.

15. In or around May or June 2019, Plaintiff SMYTHE was transferred to Defendant STOP & SHOP's supermarket located at 1001 US-6, Mahopac, NY 10541 (hereinafter "Mahopac Store") in a full-time position.

16. Shortly after being transferred to Defendant STOP & SHOP's Mahopac Store, Plaintiff SMYTHE began to experience an unbearable hostile work environment on the basis of his race and sex.

17. Specifically, David, a Produce Clerk, who had been with the company for approximately eight years, was training through the Defendant STOP & SHOP "Gold Package" Program to become "Head Manager," and acted like Plaintiff SMYTHE's supervisor, began to subject Plaintiff to offensive comments and epithets pertaining to Plaintiff's race, on a continuous basis.

18. Upon information and belief, David is Hispanic.

19. In his capacity, David trained Plaintiff SMYTHE in job duties that were new to Plaintiff and directed Plaintiff to complete tasks that needed to be performed for the day, such as setting up displays and stocking produce.

20. Upon Plaintiff commencing his employment at the Mahopac Store, David began to call Plaintiff SMYTHE "Black Cinderella" and referred to Plaintiff as such frequently and on an ongoing basis.

21. Furthermore, David would say to Pete and Morris, two part-time employees whom Plaintiff SMYTHE supervised, as well as employees in the Seafood Department, that Plaintiff was a "Bum nigga who doesn't know what he is doing" and that Plaintiff was David's "slave."

22. Morris, Pete and the Seafood Department employees communicated these offensive comments by David to Plaintiff SMYTHE who felt deeply hurt and humiliated.

23. David would also say to Plaintiff SMYTHE that "certain people would never fit in certain places no matter what they did and that even though [David was] not Caucasian, because [David had] a light skin complexion, [David was] more accepted and [was given] more privileges."

24. Plaintiff SMYTHE believed that the "certain people" that David was referring to were Black people.

25. David also stated that he had Ed Pena, Store Manager, in his "pocket."

26. Furthermore, David proudly represented to Plaintiff SMYTHE that some of his friends were members of the Ku Klux Klan.

27. Plaintiff SMYTHE felt offended, hurt, confused, and humiliated by David's ongoing discriminatory comments.

28. Plaintiff SMYTHE believed that, by informing Plaintiff that David had friends who were members of the Ku Klux Klan, David attempted to intimidate the Plaintiff.

29. Furthermore, David began to say to Pete and Morris that he was instructing Plaintiff SMYTHE to do all his work because Plaintiff was his "slave." Pete and Morris communicated this to the Plaintiff, who felt extremely offended and humiliated.

30. Upon information and belief, David also instructed the employees whom Plaintiff SMYTHE supervised, specifically Pete, Morris, and Mike, to perform their work slowly so that Plaintiff would have to perform their work.

31. As such, Pete, Morris and Mike began to refuse to carry out their job duties and responsibilities.

32. When Plaintiff SMYTHE confronted the employees about their poor work performance, Pete confessed that David instructed the employees to not carry out their work duties and responsibilities by working as slowly as possible, stating that he [David] "despised" the Plaintiff and was "trying to get him terminated."

33. Morris, on the other hand, continued to perform poorly and complained to the Store Manager, Karl, about Plaintiff SMYTHE confronting him about his work performance.

34. David's discriminatory animus toward Plaintiff SMYTHE was so deep that, upon the start of the Covid-19 pandemic, he said to Pete that he wanted to "give [Plaintiff] the coronavirus." At that time, David was exhibiting Covid-19 symptoms and had shared with his co-workers that he believed he had the virus.

35. Plaintiff SMYTHE overheard this statement and saw David blow into a plastic Ziplock bag, lick an orange, put the orange in the bag, and place it on the desk employees regularly approached to retrieve work-related items, such as work schedules and clipboards.

36. Additionally, when David asked Plaintiff SMYTHE if he had received his BlueCross BlueShield insurance card, and Plaintiff responded that he had not received it, David proceeded

to say, after informing Plaintiff of the benefits, "I got my insurance card because my kids are White."

37. Also, in or around Halloween 2020, David said to Plaintiff SMYTHE that he wished he could "kill the Black customers." When Plaintiff asked him why, David responded, "Because they are stupid and annoying."

38. Adding to an already hostile work environment, a few months into Plaintiff SMYTHE's employment at the Mahopac Store, David and Vinny, Head Produce Clerk and Plaintiff's supervisor, began to subject Plaintiff to unwanted and unwelcomed sexual remarks and touching.

39. By way of example, David and Vinny began to say to Plaintiff SMYTHE and Morris, on a regular and continuous basis, that they had anal and oral sexual intercourse with each-other and invited Plaintiff and Morris to engage in sexual activity with them.

40. Plaintiff SMYTHE felt shocked and humiliated by these unwanted and unwelcomed advances.

41. Also, on a regular and ongoing basis, David and Vinny began to say to Plaintiff SMYTHE and Morris that they had gotten other people to "become gay," that it was "alright to go both ways," and that "one never really knows what he really likes until they tried it."

42. Plaintiff SMYTHE felt appalled, humiliated, shocked, and embarrassed by David's and Vinny's persistent sexual advances toward him.

43. Furthermore, David, Vinny, and the Produce Department Manager, Alex, persistently harassed Morris regarding their perception of his sexual preference by telling him that he did not know what he wanted and that it was "okay to be gay."

44. Then, in or around November 2020, David approached Plaintiff SMYTHE from behind, while he worked, kneeled near his buttocks, made a sound as if he was sniffing, and stated, "You don't got shit in your butt, I can slide up in there."

45. Plaintiff SMYTHE felt shocked, offended, horrified, extremely hurt, and humiliated by David's predatory comment and gestures.  Plaintiff said to David that what he did was "disrespectful" and that he did not "play that way."

46. Subsequently, Plaintiff SMYTHE complained to Karl and Closing Night Manager, Dawn, about the sexual harassment and racial slurs by David.

47. Karl instructed Plaintiff SMYTHE to document his complaint in writing and informed him that it would go to the union and human resources.

48. As such, Plaintiff SMYTHE followed Karl's instructions and submitted a written complaint to Karl, addressed to Gregory Pasquale, his union representative, and human resources, the next day.

49. Karl informed Plaintiff SMYTHE that his complaint would be investigated.

50. However, Plaintiff SMYTHE was not questioned about his claims by anyone.  Instead, he was subjected to a campaign of retaliation and further harassment.

51. Specifically, David, Alex, and Vinny, along with other co-workers, antagonized Plaintiff SMYTHE on the basis of his race.

52. By way of example, they mocked the killing of Trayvon Martin, in Plaintiff SMYTHE's presence, while smirking and looking at the Plaintiff.

53. On multiple occasions, Vinny also stated to Plaintiff SMYTHE that his "old man was racist" and raised him to be racist as well.  Vinny continued by stating that when he grew up, he knew

7

that being racist was wrong and he did not "want to be that way anymore but that's all he [knew]" and he was "going to hell for it."

54. Then, in or around December 2020, Plaintiff SMYTHE approached Vinny to inform him that he had arrived at work.

55. What happened next was shocking. Vinny lunged at Plaintiff SMYTHE with a produce back-room knife, which he typically kept in his pocket. If Plaintiff had not moved to avoid the hit, Vinny would have struck him.

56. When Plaintiff SMYTHE complained to Vinny about him attempting to stab the Plaintiff, Vinny stated, "I bet you didn't see that coming."

57. Then, about an hour later, as Plaintiff SMYTHE was organizing the freezer, Vinny snuck up behind the Plaintiff, grabbed him by the neck, and, as he made contact with the Plaintiff from behind, acting as if he was having sexual intercourse with the Plaintiff, he eerily stated, "I could have raped you!"

58. Feeling attacked, Plaintiff SMYTHE broke free of Vinny's grasp and pushed him away.

59. Vinny put up both his hands exclaiming, "Chill out, chill out! I am only playing."

60. Deeply offended, shocked, humiliated, and traumatized, Plaintiff SMYTHE responded, "I do not play like that. What you did, I find offensive."

61. Plaintiff SMYTHE then walked out of the freezer and headed to the Manager's Office, but the door was closed.

62. As he walked to the Manager's Office, Plaintiff SMYTHE thought of resigning as four employees before him had done between the months of November and December, stating that they were not able to work in an unprofessional, hostile workplace.

63. Since he was not able to speak with management at that moment, Plaintiff SMYTHE took his break.

64. Upon returning from his break, as he walked into the back room of the Produce Department, Plaintiff SMYTHE stood at the entrance of the door and heard Vinny and Alex discussing Plaintiff's grievance about David, stating that the new store managers were not going to conduct an investigation and Plaintiff's grievance would be "swept under the rug."

65. Plaintiff SMYTHE then returned to the Manager's Office where he found Joseph, Store Manager.

66. Plaintiff SMYTHE asked Joseph if Karl had transferred, to which Joseph replied in the affirmative.

67. Plaintiff SMYTHE then asked Joseph if he had received Plaintiff's grievance.  Joseph first responded by stating that he was aware; then he quickly said "no" while fidgeting in his chair evasively.

68. Plaintiff SMYTHE requested a transfer to another location and entity within the umbrella of Ahold Delhaize, in South Carolina, and gave his two weeks-notice for his employment at the Mahopac Store, feeling that he had no choice but to resign from his position at the Mahopac Store where he was persistently harassed.

69. Plaintiff SMYTHE then contacted Mr. Pasquale and left him a voicemail asking Mr. Pasquale to call him back.

70. A few days later, Plaintiff SMYTHE met with Mr. Pena and Chris Vollan, Manager, in the Manager's Office, and reviewed the procedure for transferring to another store under Ahold Delhaize in South Carolina.

71. Based on Mr. Vollan's representation to Plaintiff SMYTHE, Plaintiff believed that he would be transferred to a South Carolina store, as Mr. Vollan stated that he would call stores in South Carolina regarding transferring the Plaintiff and submit a letter praising Plaintiff's good performance.

72. After Mike learned that Plaintiff SMYTHE would be transferred, he wished him well and asked him where he was going.  When Plaintiff responded that he would be transferred to South Carolina, Alex, who overheard the exchange between Mike and the Plaintiff, interfered by stating, "You think you have it bad here, you're really going to have it bad in South Carolina."

73. Alex then added, "I see blood, I see blood, I see blood," which Plaintiff interpreted as Alex referring to Plaintiff being in danger there as a Black man.

74. By way of explanation, when previously discussing racial tensions in the country with Plaintiff SMYTHE, Alex has stated to Plaintiff that there was a "race war" in the country and asked Plaintiff who would win, after telling Plaintiff that he had guns at home and was comfortable. Plaintiff SMYTHE took this to mean that Alex was communicating to Plaintiff that Black people, including the Plaintiff, would be on the losing end of the "race war."

75. Subsequently, Plaintiff SMYTHE heard Alex and Vinny laughing about how Mr. Pena and Joseph would not help Plaintiff to get a transfer and how they "swept his grievance under the rug."

76. Plaintiff SMYTHE then went to the Manager's Office where he asked Mr. Pena if there was an update regarding his request for a transfer.  Mr. Pena responded that there was no grocery store associate position available under the parent company, Ahold Delhaize, in South Carolina.

77. Plaintiff SMYTHE asked whether Mr. Pena knew about Plaintiff's grievance against David to which he responded in the negative.

78. Plaintiff SMYTHE expressed to Mr. Pena that he thought that Mr. Pena was not being truthful with him and added that he knew that Mr. Pena was "sweeping [Plaintiff's] complaint under the rug."

79. Plaintiff SMYTHE then walked out of the Manager's Office and called Mr. Pasquale leaving him another message to return his call.

80. Upon Plaintiff SMYTHE returning from having made the call, Mr. Pena approached Plaintiff and informed him that he was suspended for using insubordinate language.

81. Plaintiff SMYTHE asked several times what language he used and when he used it. However, Mr. Pena refused to respond and continued to state that Plaintiff was suspended for using insubordinate language.

82. As Plaintiff SMYTHE returned home, he received a call from Mr. Pasquale to whom Plaintiff complained about the hostile work environment to which he had been subjected at the Mahopac Store, including the sexual harassment and the racial slurs by David.

83. Furthermore, Plaintiff SMYTHE informed Mr. Pasquale of the grievance that Karl advised him to write and the suspension by Mr. Pena.

84. Mr. Pasquale promised that he would look into Plaintiff SMYTHE's complaints. However, Plaintiff was not contacted by the Defendant regarding his complaints and was never transferred to another location in South Carolina.

85. Plaintiff SMYTHE believes that he was suspended and not transferred to another store, in retaliation for his complaints of discrimination against David and Vinny.

11

86. The above are just some of the examples of harassment and discrimination that Plaintiff SMYTHE had to endure while working for Defendant.

87. As a result of Defendant's actions, Plaintiff SMYTHE felt, and continues to feel, extremely humiliated, degraded, violated, embarrassed, and emotionally distressed.

88. As a result of Defendant's discriminatory and intolerable treatment of Plaintiff SMYTHE, he suffered, and continues to suffer, severe emotional distress.

89. As a result of the acts and conduct complained of herein, Plaintiff SMYTHE has suffered, and will continue to suffer, the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses and emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

90. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional amounts of this Court.

91. As Defendant's conduct has been malicious, willful, outrageous, and conducted will full knowledge of the law, Plaintiff demands punitive damages against the Defendant.

**AS A FIRST CAUSE OF ACTION**
**UNDER TITLE VII**
**DISCRIMINATION**

92. Plaintiff SMYTHE repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

93. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964; 42 U.S.C. Section(s) 2000e *et seq.*, as amended, for relief based upon the unlawful employment practices of the above-named Defendant. Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in

part, upon an employee's sex and race.

94. Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by discriminating against Plaintiff because of his sex and race, creating a hostile work environment.

**AS A SECOND CAUSE OF ACTION**
**UNDER STATE LAW**
**DISCRIMINATION**

95. Plaintiff SMYTHE repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

96. Executive Law § 296 provides that, "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's . . .race...sex. . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

97. Defendant engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of his sex and race.

**AS A THIRD CAUSE OF ACTION**
**UNDER STATE LAW**
**RETALIATION**

98. Plaintiff SMYTHE repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

99. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

13

100.   Defendant engaged in an unlawful discriminatory practice by retaliating against the Plaintiff in suspending him and not transferring him to another store because of his opposition to his employer's unlawful employment practices.

**JURY DEMAND**

101.   Plaintiff SMYTHE requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff SMYTHE respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful employment practices prohibited by Title VII and the NYSHRL, and that Defendant subjected Plaintiff to a hostile work environment on the basis of his sex and race and retaliation in response to his good faith complaints of discrimination;

B. Awarding damages to the Plaintiff, for all lost wages and benefits, past and future, back pay and front pay and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant' unlawful employment practices.

Dated:  May 18 , 2022
         New York, NY

By:

**PHILLIPS & ASSOCIATES,**
**Attorneys at Law, PLLC**
*Attorneys for Plaintiff*
Dorina Cela, Esq.
Hannah Kucine, Esq.
45 Broadway, Suite 430
New York, NY 10006
(212) 248-7431
dcela@tpglaws.com
hkucine@tpglaws.com

15

# EXHIBIT A

EEOC Form 161-B (11/09)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: **Mr. Akeim Smythe**
**1300 Lake Bowen Dam Road**

**Inman, SC 29349**

From: **New York District Office**
**33 Whitehall St ,5th Floor**
**New York, New York 10004**

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2021-03991** | **Gwendolyn Hoy,**<br>**Investigator** | **(929) 506-5313** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

for

Enclosures(s)

**Judy Keenan,**
**District Director**

*(Date Mailed)*

cc: **Robert Waterman**
**Attorney for Respondent**
**ROYAL AHOLD-THE STOP & SHOP SUPERMARKET**
**COMPANY, LLC**
**PO BOX 55888**
**Boston, MA 02205**

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***